**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

CHRISTINE GILLAM, SEMETRICA SHADWICK, :
STEVEN PIKE, DENIS GETER, and ELWOOD :
BUMBRAY, *on behalf of themselves and all* :
*Individuals similarly situated,* :   Case No. 3:18-cv-00473 (REP)
                            :
              Plaintiffs, :
                            :
v. :
                            :
DAN KOETTING; ROCK HILL CONSULTING, :
LLC; GREEN GATE SERVICES, LLC; :
MARK KOETTING; REDONDO MANAGEMENT, :
LLC; CLEAR LOAN SOLUTIONS, LLC, :
                            :
              Defendants. :
_____ :

## FIRST AMENDED CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Christine Gillam, Semetrica Shadwick, Steven Pike, Denis Geter, and Elwood Bumbray ("Plaintiffs"), on behalf of themselves and all individuals similarly situated, by counsel, and for their Class Action Complaint against Defendants, they allege as follows:

## INTRODUCTION

1.    This case arises from an illegal lending enterprise created and operated by Defendants Dan Koetting and Mark Koetting (collectively "the Koetting Brothers"). After several regulatory authorities issued cease-and-desist orders to their now defunct payday lending companies,[1] the Koetting Brothers established a "rent-a-tribe" lending model where an illegal loan is originated in the name of a tribal entity, but the tribal entity serves as nothing more than the

---

[1] *In re the Matter of: State of New Hampshire Banking Department v. Alpine Direct Services, LLC*, Case No. 10-423 (Sept. 14, 2011), attached as Exhibit 1; Desist and Refrain Order, State of California Department of Corporations (May 8, 2006), attached as Exhibit 2.

conduit for the loan in return for a small fee.[2] The apparent purpose for adopting the rent-a-tribe model was so that the Koetting Brothers could continue with their illegal lending practices while evading state regulatory authorities.

2.      Plaintiffs are Virginia residents who were lured, through aggressive marketing and lead generation tactics, into taking out high-interest loans with Green Gate Services, LLC ("Green Gate") and Clear Loan Solutions, LLC ("Clear Loan")—two entities formed pursuant to the laws of the Big Lagoon Rancheria (the "Tribe"), a federally recognized tribe with 17 members.[3] Green Gate and Clear Loan were organized under the laws of the Big Lagoon Rancheria to facilitate erroneous claims that the loans were "not subject to the laws of the United States or any of its states." July 10, 2014 Loan Agreement, attached as Exhibit 3 at 4.

3.      Although the Tribe is held out as the "lender" of the loans, the Koetting Brother's companies, namely Rock Hill Consulting, LLC ("Rock Hill") and Redondo Management, LLC ("Redondo"), received the overwhelming majority of the profits and controlled the operations of the lending enterprise. Indeed, contrary to the front portrayed in the loan agreements, Green Gate and Clear Loan are nothing more than nominal participants in the lending activities of the enterprise. For example, industry participants have identified Rock Hill as the "lender" of these loans. Jan. 17, 2017 Consumer Disclosure for Pike, attached as Exhibit 4 (identifying "Rock Hill Consulting" as the "creditor" for Pike's loan originated on July 10, 2014); May 24, 2018 Letter to

---

[2] *See, e.g.,* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012) (providing background on payday loans and describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance").

[3] *See, e.g.*, Big Lagoon Rancheria, Tribal History, Reservation Demographics, Governance and Existing and Planned Commercial Ventures, *available at* http://www.mrgmi.com/Big%20Lagoon%20Background.pdf.

Pike, attached as Exhibit 5 (explaining that Rock Hill was the "lending company" for Pike's loan); Exhibit 6 (showing Rock Hill was the company that obtained Bumbray's credit report).

4.      Each of Plaintiffs' loans carried triple-digit interest rates, ranging between 396-756 percent, *i.e.*, 30 to 60 times higher than the 12% interest-rate cap permitted in Virginia. Va. Code § 6.2-303. If a person makes a loan exceeding 12% APR without a license in Virginia, Virginia's Consumer Finance Act provides that the "loan contract shall be ***void***," and it prohibits the collection of "any principal, interest, or charges whatsoever with respect to the loan." Va. Code § 6.2-1541(A)-(B). Three of the named Plaintiffs ended up paying more than $1,700 on these void loans, including Ms. Geter who repaid more than $4,500.00. Accordingly, Plaintiffs assert a class claim against Defendants for their violations of Virginia's usury laws and seek to disgorge all amounts repaid by Virginia consumers, plus twice the amount of the usurious interest that was paid in the two years preceding the filing of this action, and their attorneys' fees and costs. Va. Code § 6.2-305(A).

5.      In addition, Plaintiffs further allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Among other things, RICO prohibits the collection of "unlawful debt," which the statute defines as debt "which is ***unenforceable under State*** or Federal law in whole or in part as to principal or interest because of laws relating to usury," where "the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6) (emphasis added). Because the usurious rates on the loans were "twice the enforceable rate" under Virginia law, Defendants collected "unlawful debt" from Plaintiffs in violation of § 1962(c)-(d) of RICO.

## JURISDICTION

6.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28

U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims

pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a majority of

Plaintiffs are residents of this District and Division and a substantial part of Plaintiffs' claims

occurred in Virginia.

## PARTIES

8.      Plaintiff Christine Gillam ("Gillam") is a natural person and resident of this

Division and District.

9.      Plaintiff Semetrica Shadwick ("Shadwick") is a natural person and resident of this

Division and District.

10.     Plaintiff Steven Pike ("Pike") is a natural person and resident of Ashburn, Virginia.

11.     Plaintiff Denis Geter ("Geter") is a natural person and resident of Arlington,

Virginia.

12.     Plaintiff Elwood Bumbray ("Bumbray") is a natural person and resident of Catlett,

Virginia.

13.     Defendant Dan Koetting ("Koetting") is a natural person and resident of San Diego,

California. Dan Koetting is the founder and chief executive officer of Rock Hill Consulting, which

he created to facilitate the making and collection of the usurious loans described herein. As detailed

below, Dan Koetting personally participated in and oversaw the illegal lending enterprise

rendering him personally liable. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV15-7522,

2018 WL 485963, at *11 (C.D. Cal. Jan. 19, 2018) (finding the president and chief executive

officer of a rent-a-tribe lending business liable for a $10.2 million-dollar judgment because "he directly participated in and had the ability to control" the deceptive acts).

14.     Defendant Rock Hill is a limited liability company formed under the laws of Delaware with a principal place of business at 1111 6th Avenue, San Diego, California, 92101. Dan Koetting is the founder and chief executive officer of Rock Hill.

15.     Defendant Green Gate is a limited liability company formed under the laws of the Big Lagoon Rancheria. In return for a small fraction of the revenue, the Tribe formed Green Gate under tribal law and allowed it to falsely claim that it was operated by the Tribe. At all times relevant hereto, the Tribe did not participate in the day-to-day operations of Green Gate, did not fund the loans or handle the servicing or collection of the loans, and received a nominal percentage of the proceeds from the loans. Instead, Green Gate served as a front for the illegal lending activities of the Koetting Brothers and their companies, Rock Hill and Redondo.

16.     Defendant Mark Koetting is a natural person and resident of Overland Park, Kansas. Mark Koetting is the founder and chief executive officer of Redondo Management, LLC, which he created to facilitate the making and collection of the usurious loans described herein. As detailed below, Mark Koetting personally participated in and oversaw the illegal lending enterprise rendering him personally liable.

17.     Defendant Redondo is a limited liability company formed under the laws of Delaware with a principal place of business in Overland Park, Kansas. Mark Koetting is the founder and chief executive officer of Redondo.

18.     Defendant Clear Loan is a limited liability company formed under the laws of the Big Lagoon Rancheria. In return for a small fraction of the revenue, the Tribe formed Clear Loan under tribal law and allowed it to falsely claim that it was operated by the Tribe. At all times

5

relevant hereto, the Tribe did not participate in the day-to-day operations of Clear Loan, did not

fund the loans or handle the servicing or collection of the loans, and received a nominal percentage

of the proceeds from the loans. Instead, Clear Loan served as a front for the illegal lending

activities of Koetting Brothers and their companies, Rock Hill and Redondo.

## BACKGROUND

**A.      Virginia law prohibits usury and provides for strict licensing requirements to protect consumers from predatory and abusive lending practices.**

19.     More than forty years before the signing of the Declaration of Independence,

Virginia enacted its first usury law, which capped interest rates at 6 percent. John W. Edmonds III,

Virginia Law of Interest and Usury, 10 U. Rich. L.R. 77 (1975) *available at*

https://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1313&context=lawreview.

20.     Virginia's "usury laws serve a beneficial public purpose and are to be liberally

construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg.*

*& Inv. Corp.*, 226 Va. 596, 601 (1984).

21.     The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury

statutes represent a clarification of the public policy of the state that usury is not to be tolerated,

and the court should therefore be chary in permitting this policy to be thwarted." *Id*. (quoting

*Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

22.     In accordance with this longstanding public policy, a person may not charge an

annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license

from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A).

23.     If a person violates the interest rate cap, Virginia's Consumer Finance Act imposes

severe consequences, including criminal liability and forfeiture of all principal, interest, and any

charges related to the loan. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person

who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible).

24.     The CFA is designed to protect Virginia consumers from predatory lenders, who have sought to evade state lending laws like Virginia's by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Martin & Schwartz, *supra* note 2, at 758–759).

25.     Virginia's Consumer Finance Act is a remedial statute that "originated to protect needy consumers from unjust terms and exploitation surrounding lending practices." *Com. v. Car Pawn of Virginia, Inc.*, 1995 WL 17044380, at *4 (Va. Cir. 1995); *see Greenberg v. Com. ex rel. Atty. Gen.*, 499 S.E.2d 266, 269 (Va. 1998). Thus, it was designed to protect Virginia consumers from the very type of predatory lending scheme Defendants participated in, which sought to evade state lending laws, including Virginia's, through the rent-a-tribe scheme "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Martin & Schwartz, *supra* note 2, at 758–759).

**B.     The rent-a-tribe model was developed to evade state usury laws, such as Virginia's.**

26.     Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a

repayment system that involves the lender withdrawing funds directly from the borrower's bank account."[4] These types of debt traps "are heavily marketed to financially vulnerable consumers."[5]

27.     In a "payday" loan, a consumer who can't afford to wait until payday receives a cash advance and, in exchange, the lender subtracts a larger amount from the consumer's paycheck. Consumers renew the loans when they are unable to pay them off, creating a cycle of mounting debt.

28.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* note 2, at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

29.     It is no secret that "internet payday lenders have a weak history of complying with state laws." *Id*. at 764. Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[6]

---

[4] *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

[5] *See CFPB Finalizes Rule To Stop Payday Debt Traps*, CFPB (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. "A debt trap results when a borrower is repeatedly unable to repay a loan and must reborrow, paying additional fees each time." *See Payday, Vehicle Title, and Certain High-Cost Installment Loans*, *supra* note 4, at 1853.

[6] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

30.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n. 16 (2012).

31.     In response to the crackdown on rent-a-bank arrangement, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id.*; *see also* Martin & Schwartz, *supra* note 2.

32.     "In these partnerships, online payday lenders register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign immunity. Using this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation only, not the laws of the state in which the reservation is located or the state in which the borrower resides." Johnson, *supra* ¶ 30, at 399.

33.     A central feature of the rent-a-tribe business model is the choice-of-law provision used in the scheme's lending agreements. The non-tribal participants in the scheme will claim that they have no liability for their violations of state and federal laws because only tribal law applies to the loans. Such claims have been uniformly denied by courts from a variety of jurisdictions across the country, thus demonstrating the illegality of the rent-a-tribe lending scheme.[7]

---

[7] *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v.*

**C.      The Koetting Brothers adopted the rent-a-tribe scheme to evade state usury laws, such as Virginia's, and they continue to use the rent-a-tribe model even though it has been largely discredited.**

34.      Prior to adopting the rent-a-tribe model, Dan Koetting was the owner of a company known as Alpine Direct Services, LLC ("Alpine").

35.      Alpine was a limited liability company organized under the laws of the state of Nevada with a principal place of business at 1111 6th Avenue, San Diego, California, 92101—the same address now used by Rock Hill.

36.      On May 25, 2011, the State of New Hampshire Banking Department issued a cease and desist to Dan Koetting and Alpine concerning a short-term, high-interest loan greater than the 36% interest-rate cap in New Hampshire. *See In re the Matter of: State of New Hampshire Banking Dep't v. Alpine Direct Servs., LLC*, Case No. 10-423 (Sept. 14, 2011), attached as Exhibit 1 at ¶¶ 13, 17.

37.      In response, Dan Koetting and Alpine indicated that they "had ceased from engaging in any transactions in the State of New Hampshire and cancelled all outstanding transactions" in New Hampshire. Ex. 1 at ¶ 18.

38.      Around this same time, Claudia Callaway, Dan Koetting's attorney,[8] was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state

---

*BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes*, 811 F.3d at 675; *Rideout v. CashCall, Inc.*, No.  2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

[8] Callaway represented Koetting as early as August 11, 2011. *See Qualls v. Alpine Direct Servs., LLC*, Case No. 1:11-cv-05465 (N.D. Ill. 2011).

10

regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV15-7522, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

39.     Callaway presented herself to her clients as someone who could "'facilitate relationships' and provide opportunities" for payday lenders "to diversify and structure a lending model within requirements of law to 'avoid enforcement actions by state and federal regulators." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV15-07522, 2018 WL 485963, at *2 (C.D. Cal. Jan. 19, 2018). Callaway was further advising her clients that "because the loans made pursuant to the Tribal Lending Model were originated by a tribe or tribal member, the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id.* at 3.

40.     Federal courts across the country have rejected Callaway's regulation-avoidance theory, leading to multi-million-dollar enforcement actions and class action settlements, including a $15 million-dollar class action for Virginia consumers arising from a rent-a-tribe lending scheme. *See Hayes v. Delbert Servs. Corp.*, 3:14-cv-00258-JAG, Doc. 193 at 9-12 (Jan. 20, 2017).[9] Indeed,

---

[9] *See, e.g.*, Press Release, Office of Att'y Gen., Ga., Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender (Feb. 8, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40-million-plus-settlement-online ($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and $500,00 attorney's fees and costs); See News Release, Att'Gen. Pam Bondi, Fl., Attorney General Bondi and OFR Reach Multimillion Dollar Settlements with Online Lender (Jan. 12, 2017), http://myfloridalegal.com/__852562220065EE67.nsf/0/2F836464563D0EB5852580A60070937 0? ($11 million in compensation, $15 million in loan forgiveness, $500,000 civil penalty, $500,000 administrative fine, and $250,000 for costs); *Internet Lender CashCall, Inc. Barred from Doing Business in Minnesota*, Minn. Att'y Gen. Lori Swanson, https://www.ag.state.mn.us/Office/PressRelease/20160819InternetLender.asp (last visited May 24, 2017) ($11.7 million in monetary relief including a $4.5 million restitution fund); Att'y Gen. Roy Cooper, *Fast Cash Loans Cost More than You Bargain For*, N.C. Dep't of Justice (July 8, 2016), http://www.ncdoj.gov/News-and-Alerts/Consumer-Columns/Fast-cash-loans-cost-more-than-you-bargain-for.aspx ($9 million in compensation); Press Release, Wash. Dep't of Fin. Inst., Washington DFI Enters Settlement Agreement With CashCall and Western Sky Financial Over Unlicensed Internet Predatory Lending Activities (Oct. 21, 2015),

Callaway is associated with CashCall, Inc. and Great Plains Lending. CashCall has been largely unsuccessful in defending the rent-a-tribe model,[10] while courts have also expressed skepticism of Great Plains, including the Fourth Circuit's decision describing the Great Plains lending agreements as a "calculated attempt to avoid the application of state and federal law."[11]

41.    Nonetheless, even though private lawsuits and regulatory actions have discredited the rent-a-tribe lending model, Defendants continue to engage in this misconduct through the origination and collection of usurious loans to Virginia consumers.

---

http://dfi.wa.gov/news/press/washington-dfi-enters-settlement-agreement-cashcall-and-western-sky-financial-over ($1.9 million in refund payments); Media Release, Mich. Att'y Gen. Bill Schuette, Schuette, Flood Net $2.2 Million for Michigan Consumers in Western Sky and CashCall Settlement Involving High-Interest Loans (May 14, 2015), http://www.michigan.gov/ag/0,4534,7-164-46849-354551--,00.html ($2.2 million settlement fund).

[10] See cases cited *supra* in note 7; *see also Jackson v. Payday Fin., LLC*, 764 F.3d 765, 770 (7th Cir. 2014) (noting that the District Court found "[t]he intrusion of the Cheyenne River Sioux Tribal Nation into the contractual arbitration provision appear[ed] to be merely an attempt to escape otherwise applicable limits on interest charges. As such, the promise of a meaningful and fairly conducted arbitration [wa]s a sham and an illusion."; and agreeing that the arbitral mechanism was a "sham from stem to stem").

[11] *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 337 (4th Cir. 2017) (concluding that choice-of-law and arbitration provisions in Great Plains' lending agreement were unenforceable and describing the provisions as "a calculated attempt to avoid the application of state and federal law" and part of an "integrated scheme to contravene public policy" (quoting *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 676 (4th Cir. 2016)); *Otoe-Missouria Tribe of Indians v. New York State Dept. of Fin. Services*, 769 F.3d 105, 114 (2d Cir. 2014) (noting that "a tribe has no legitimate interest in selling an opportunity to evade state law" and concluding that the Otoe-Missouria Tribe of Indians failed to establish a reasonable likelihood of success that Great Plains' lending activity was outside the reach of New York regulatory authority);.

**D.**     **The Tribe was a nominal participant, while Defendants directed and controlled the operations.**

42.     The Koetting Brothers are the architects of the rent-a-tribe lending enterprise described herein—they are of the few yet to be criminally convicted for their role in this type of lending scheme.[12]

43.     Upon information and belief, the Koetting Brothers, Clear Loan, Green Gate, Rock Hill, Redondo, the Tribe, and others agreed to participate in the enterprise to lend at usurious interest rates in violation of state usury laws.

44.     Dan Koetting is the president, chief executive officer, and majority shareholder of Rock Hill, as well as several other companies who participated in the rent-a-tribe enterprise.

45.     Mark Koetting is the president, chief executive officer, and majority shareholder of Redondo, who participated in the rent-a-tribe enterprise.

46.     Although the Tribe is held out as the lender of the loans issued in the name of Green Gate, the Tribe is merely a front, and Rock Hill provides the infrastructure to market, fund, underwrite, and collect the Green Gate loans.

47.     Similarly, although the Tribe is held out as the lender of the loans issued in the name of Clear Loan, the Tribe is merely a front, and Redondo provides the infrastructure to market, fund, underwrite, and collect the Clear Loan loans.

---

[12] *See* The United States Attorney's Office, Southern District of New York, Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

48.     Indeed, contrary to the front portrayed in the loan agreements, one of Rock Hill's clients, Data X, identified Rock Hill as the "lender" of Pike's loan originated in the name of Green Gate. *See* Jan. 17, 2017 Consumer Disclosure for Pike, attached as Exhibit 4.

49.     In return for the use of its name as a front, the Big Lagoon Rancheria receives a nominal flat fee of the revenue generated from the loans.

50.     After accounting for expenses and payments to investors, the remaining profits from Green Gate are distributed to Dan Koetting and Rock Hill.

51.     Upon information and belief, the Tribe similarly receives a nominal flat fee of the revenue generated from the Clear Loan loans, and the remaining profits are distributed to Mark Koetting and Redondo.

52.     Upon information and belief, tribal members do not participate in the day-to-day operations of Green Gate or Clear Loan and nearly all the activities associated with the lending operation occur in San Diego and Overland Park.

53.     Upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned or controlled by Dan Koetting and Rock Hill or Mark Koetting and Redondo, and neither the Tribe nor its officials are allowed to use the money in any accounts of Green Gate or Clear Loans.

**E.     Defendants' made, serviced, and collected on loans to Virginia consumers in violation of Virginia's usury and licensing laws.**

54.     Defendants marketed, initiated, and collected usurious loans in Virginia.

55.     In order to qualify for the loan product, consumers were required to electronically sign a form contract created by Callaway for her clients, such as the Koetting Brothers.

56.     Under the terms of the standard Loan Agreements, the interest rates charged were significantly greater than 12% APR.

57.     For example, Pike's loan had an APR of 521%, Ex. 3 at 1, which is more than 40 times the 12% interest cap in Virginia for companies that are not licensed by the Commission. Va. Code § 6.2-303(A).

58.     Similarly, Gillam's loan had an APR of 756%; Shadwick's loan had an APR of 677%; Geter's loan had an APR of 521%; and Bumbray's loan had an APR of 396%.

59.     None of the Defendants had a consumer finance license permitting them to make loans charging interest greater than 12% APR when they made the loans to Plaintiffs nor did they ever attempt to obtain such a license. *See* Va. Code § 6.2-1501. The Tribe also did not have a consumer finance license in Virginia.

60.     Accordingly, Defendants' loans are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

61.     By extension, the arbitration and choice-of-law provisions in the loans' lending agreements are also unenforceable for, *inter alia*, violating Virginia's public policy against usury.

62.     Defendants received at least $950 from Pike as a result of his illegal loan—most of which Defendants credited as payment for interest or other fees.

63.     Defendants received at least $317 from Gillam as a result of her illegal loan—most of which Defendants credited as payment for interest or other fees.

64.     Defendants received at least $1,780 from Shadwick as a result of her illegal loan—most of which Defendants credited as payment for interest or other fees.

65.     Defendants received at least $4,593 from Geter as a result of her illegal loan—most of which Defendants credited as payment for interest or other fees.

66.     Defendants received at least $1,830 from Bumbray as a result of his illegal loans—most of which Defendants credited as payment for interest or other fees.

67.     Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c); *see also* 18 U.S.C. § 1961(6) (defining "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate").

68.     As a result of Defendants' conduct, including participation in the enterprise, Defendants are liable to Plaintiffs and the class for twice the total amount of interest paid on the usurious loans pursuant to Va. Code § 6.2-305(A), and Defendants are also jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

69.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

70.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

>      All Virginia residents who executed a loan with Green Gate or Clear Loan where the loan was originated and/or any payment was made.

71.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

>      All consumers residing in Virginia when they entered into a loan agreement with Green Gate or Clear Loans where the loan was originated and/or any payment was made on or after July 10, 2014.

72. **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

73. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an "enterprise" under RICO existed; (2) whether Defendants conducted the affairs or participated in the enterprise's affairs; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against each Defendant.

74. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

75. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

76.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

77.    **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein, including a prohibition on collections from Virginia consumers and/or the sale of the loans to third parties; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

78.    All of the loans made to Virginia residents included an interest rate far in excess of twice the enforceable rate in Virginia.

79.     As alleged above, Defendants associated with an enterprise that existed for the purpose of collection of unlawful debt, agreed that the enterprise would engage in the collection of unlawful debt, and participated in the affairs of the enterprise.

80.     Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Plaintiffs to repay amounts on unlawful loans.

81.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

82.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

83.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> All Virginia residents who executed a loan with Green Gate or Clear Loans where the loan was originated and/or any payment was made.

84.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a subclass initially defined as:

> All consumers residing in Virginia when they entered into a loan agreement with Green Gate or Clear Loans where the loan was originated and/or any payment was made on or after July 10, 2014.

85.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

86.   **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).**
Common questions of law and fact exist as to all members of the putative class, and there are no
factual or legal issues that differ between the putative class members. These questions predominate
over the questions affecting only individual class members. The common questions include: (1)
whether an "enterprise" under RICO existed; (2) whether Defendants agreed that the enterprise
would engage in the collection of unlawful debt; (3) whether the loans are "unlawful debt" for
purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against
each Defendant.

87.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of
each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of
action as the other members of the putative class. All are based on the same facts and legal theories.

88.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate
representatives of the putative class because their interests coincide with, and are not antagonistic
to, the interests of the members of the class they seek to represent; they have retained counsel
competent and experienced in such litigation; and they have and intend to continue to prosecute
the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of
the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause
them not to vigorously pursue this action.

89.   **Injunctive Relief Appropriate for the Class.   Fed. R. Civ. P. 23(b)(2).** Class
certification is appropriate because Defendants acted on grounds generally applicable to the class,
making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members.
Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of
any interest in the enterprise pled herein, including the receipt of racketeering profits; prohibiting

Defendants from continuing to engage in the enterprise, including a prohibition on collections from Virginia consumers and/or the sale of the loans to third parties; and ordering the dissolution of each Defendant that has engaged in the enterprise.

90.     As alleged above, Defendants violated § 1962(d) of RICO by conspiring to violate §§ 1962(a)-(c).

91.     Each of Defendants agreed to participate in the enterprise. Each of Defendants agreed that the enterprise would engage in the collection of unlawful debt. And, each of Defendants agreed to take actions that would induce Plaintiffs and Virginia consumers to make payments on the void loans.

92.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

**COUNT THREE:**
**VIOLATIONS OF VIRGINIA USURY LAWS**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

93.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

94.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **Virginia Usury Class**: All Virginia residents who made a payment on any loan with Green Gate or Clear Loans.

> **Virginia Usury Subclass**: All Virginia residents who made a payment on any loan with Green Gate or Clear Loans on or after July 10, 2016.

> Plaintiffs are members of the Virginia Usury Class and Subclass.

95.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class

members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

96.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to Virginia consumers charged interest in excess of that permitted by Virginia law; (2) whether Plaintiffs may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against each Defendant.

97.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

98.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

99.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The

damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

100.    All of the loans made to Virginia consumers in the name of Green Gate or Clear Loans contained interest rates greater than 12%.

101.    Defendants each received revenues collected on the loans.

102.    Plaintiffs each paid interest in excess of that permitted by Virginia law.

103.    Accordingly, Plaintiffs and the class members are entitled to recover all amounts repaid on the void loans, plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorney's fees and costs. Va. Code §§ 6.2-1541; 6.2-305(A).

## COUNT FOUR:
## UNJUST ENRICHMENT
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

104.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

105.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia Unjust Enrichment Class"—initially defined as follows:

> **Virginia Unjust Enrichment Class**: All Virginia residents who executed a loan with Green Gate or Clear Loans where any amount of principal, interest, fees, or other charges were repaid.

> Plaintiffs are members of the unjust enrichment class.

106.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

107.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

108.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

109.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic

to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

110.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

111.    All of the loans to Virginia consumers in the name of Green Gate or Clear Loans were void and unenforceable.

112.    Plaintiffs conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

113.    Accordingly, on behalf of themselves and all other Virginia consumers similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Green Gate or Clear Loans.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendants for:

A.    Certification for this matter to proceed as a class action;

B.    Declaratory, injunctive, and damages relief as pled herein;

C.    Attorney's fees, litigation expenses, and costs of suit; and

D.    Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By:_____/s/ Kristi C. Kelly_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of September, 2018, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record.


_____/s/_____
Kristi Cahoon Kelly (VSB# 72791)
KELLY & CRANDALL, PLC
3925 Chain Bridge Rd, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyandcrandall.com
*Counsel for Plaintiffs*